(No. 19808.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CARL HADFIELD, Plaintiff in Error.

*Opinion filed December 20, 1929.*

D. L. DUTY, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, J. ROY BROWNING, State's Attorney, MERRILL F. WEHMHOFF, and ARTHUR J. MELVIN, (S. E. QUINDRY, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Carl Hadfield was convicted in the circuit court of Williamson county of manslaughter and has sued out a writ of error.

The indictment consisted of two counts, each charging that the defendant unlawfully, feloniously and negligently made an assault upon J. B. Kuykendall by driving a motor vehicle operated unlawfully upon a public highway by the defendant against the said Kuykendall; and the second charging that the defendant was drunk at the time.

The collision resulting in the homicide occurred on Sunday, February 3, 1929, on Route 13 of the State hard road system a few miles west of Marion. Hadfield lived with his parents in the city of Carterville, west of Marion. A paved road extends from Carterville south two and a half miles to Route 13. Hadfield and his parents testified that he got up that Sunday morning about eleven o'clock and had his breakfast, after which he remained at the house

and had his dinner before the regular dinner, about twelve o'clock, after which he left for Marion, driving a five-passenger Dodge sedan. They testified that he was not away from the house before he left for Marion and was not drunk or under the influence of intoxicating liquor. He testified that he drove up-town ten blocks to the square, where he stopped, got out of his car and walked up and down the street a few minutes but did not go into any place of business and saw only a few people. He stopped at the filling station and got some gas and oil. He left Carterville about one o'clock. There was snow on the road. About a half mile east of the junction of the road from Carterville with Route 13 he was traveling about twenty-five miles an hour. A car from the east was coming at about the same speed, and as far as he could see it was on the proper side of the road. Ten or twenty feet before they met Hadfield's left front tire blew out. After that he remembered nothing. Everything was blank to him. He woke up in the back seat of his car. He lost control of his car—could not get it straightened up—that was all. He was not drunk, had not had a drink that day, was awake, had all his mental faculties, knew what he was doing and was not driving zigzag. The evidence shows that there was a large hole in the left front tire of each car.

The car which Hadfield saw coming from the east, meeting him, was a Chrysler car driven by J. B. Kuykendall, a resident of Vienna, Illinois. The two automobiles going at the speed of twenty-five miles an hour came together with a great shock, and Kuykendall, who was eighty-seven years old, was so severely injured that he died the same day, three or four hours after the collision. After the crash the Chrysler car was entirely north of the black line in the center of the road and the Dodge car was standing at an angle of approximately forty-five degrees across the road, with both front wheels and one hind wheel north of the black center line and the other hind wheel on the line.

Bill Burton, who conducted a filling station in Carterville, testified that he saw Hadfield after one o'clock that Sunday afternoon at the station, sold him gas and oil and had some conversation with him; that Hadfield told him he was going to Marion, and he told Hadfield that he had better not go over but had better stay at home. Burton was well acquainted with Hadfield, and testified that Hadfield was sitting down and hardly acted as he did on other occasions and was not talking as he talked before; that he did not usually talk as much as he did that day. In answer to the question whether he was of the opinion Hadfield had been drinking intoxicating liquors, Burton said, "Well, he wasn't acting usual," and that was the only way he could answer the question.

James Fozzard, also a resident of Carterville, testified that he saw Hadfield at Burton's filling station between one and two o'clock on the day of the collision, sitting in his car, with his head leaning over on the back of the seat. He heard him talk but could not tell what he said. There was something wrong with him, but the witness did not know exactly what it was.

Frank Winters testified that he saw Hadfield Sunday afternoon at one o'clock, or a little later, and he did nothing out of the ordinary that Winters saw. He was sitting in his car, getting ready to drive off, and Winters did not see anything there to indicate that he was intoxicated. Winters was paying more attention to driving to get into the filling station than he was to Hadfield. Three other residents of Carterville saw Hadfield driving his car that afternoon and did not notice that he was drunk.

Hadfield drove from the filling station to Route 13, and E. L. Hess, of Harrisburg, who was driving east on that road, was about 75 to 100 feet behind Hadfield's car as it turned east on Route 13, both cars traveling about twenty-five miles an hour. Hess noticed that Hadfield's car was weaving from one side of the black line to the other, and

through the back window of Hadfield's car he saw Hadfield also weaving with the car. After following Hadfield about half a mile Hess saw it again swerve to the left of the black line and the crash occurred. This was about 1:30 in the afternoon. This evidence tends to show that more than an hour had elapsed after Hadfield left his home before he started from Carterville to Marion, and in that period something had happened to him which was so apparent in his conduct as to cause Burton to advise him to go home and which caused him to drive his car back and forth across the black line in the center of the concrete highway. The testimony of Hadfield that he spent only five or ten minutes on the street of Carterville and that he was not drunk and did not have a drink that day created a conflict which it was the province of the jury to decide.

After the collision Hess opened the door of Hadfield's car and found him lying over in the seat. Hess then went to the assistance of the occupants of the other car. Thomas H. Hale, who lived in Carterville and was acquainted with Hadfield, arrived on the scene shortly after the collision. When he first saw Hadfield he was lying on his right side in the front seat of his car, apparently unconscious, cut about the face and bleeding. He tried to get Hadfield out of his car, and Hadfield had regained consciousness before he left, was standing up and talked with Hale. He did not want to leave his car. Later, Frank Hill, manager of a furniture and undertaking business in Carterville, arrived with an ambulance. Hadfield then was in the rear seat of his car and was conscious. Hill had a conversation with him and at Hadfield's request took him to Marion in his ambulance. Hill expressed the opinion that he was intoxicated. He smelt the odor of intoxicating liquor on his breath. Hill stated that he was not able to distinguish between the intoxication and the shock he might have sustained to say whether the intoxication was controlling him more or the shock was controlling him more. There was

the evidence of other witnesses as to the spilling of alcohol from the radiators as the result of the collision and the smell of alcohol pervading the atmosphere around the cars and as to the actions of Hadfield, the result of it all being that there was a question of fact as to the defendant's intoxication, upon which there was contradictory evidence. The issue was one for the jury to determine, and the verdict cannot be interfered with because it is not sustained by the evidence.

The court gave to the jury, at the request of the State's attorney, the instruction complained of in the case of *People* v. *Schwartz*, 298 Ill. 218, and set forth on page 222 of the opinion, omitting the words, "if you find from the evidence that he was so negligent or did willfully omit his said duty," which it was said in the opinion might better have been omitted from the instruction. The instruction was held in that case not to be erroneous. The criticism made of this instruction is that it would be wholly bad even in a civil case, because it does not require the finding by the jury of the material matters therein set out by even a greater weight of the evidence; and in a criminal case the objection is even greater, because in such case all material matters constituting the offense must be proved to the satisfaction of the jury beyond all reasonable doubt. In discussing this instruction the opinion states: "What the jury must believe from the evidence before a verdict of guilty can be rendered is stated, * * * and that is, that the defendant in driving his automobile knew of the danger of collision and recklessly and negligently or wantonly did run down and collide with the deceased without using such means as were reasonably at his command to prevent such running down or collision." The facts thus stated amount to criminal negligence, which makes the defendant penally responsible for the result of his negligence or willful omission of duty. The statement of the material elements necessary to constitute the crime is complete. The additional criticism

made by counsel, which was not mentioned in the *Schwartz case,* that the instruction does not require the proof of all material matters constituting the offense to the satisfaction of the jury beyond all reasonable doubt, would be justified if this were the only instruction given in the case. The jury were told in at least half a dozen instructions given at the instance of the plaintiff in error, that the law imposed upon the prosecution the burden of proving the defendant guilty beyond all reasonable doubt; that to justify his conviction he must be proved guilty so clearly and conclusively that there is no reasonable theory, based upon the evidence in the case, upon which he can be innocent when all the evidence is considered together, and in other forms. These instructions given required proof of guilt beyond all reasonable doubt. It is not necessary to state all the law applicable to the case in every instruction, even an instruction which directs a verdict. The presumption of innocence to which the defendant is entitled throughout his trial, the rule that the indictment against him is no evidence of his guilt, as well as the rule which requires proof of guilt beyond all reasonable doubt, are all propositions which the defendant is entitled to have given to the jury, but it is not essential that they should be included in every instruction given.

The ninth instruction given for the People was as follows:

"You are further instructed that if you believe and find from the evidence, beyond a reasonable doubt, that the defendant killed the deceased and that such killing was involuntary on his part, yet, if you believe that the killing occurred while the defendant was in the commission of an unlawful act, and was the result of such unlawful act, then and under such circumstances the defendant would be guilty of manslaughter and you should so find by your verdict."

The criticism made of it, that it directs a verdict without requiring the jury to find from the evidence, beyond a

reasonable doubt, that the killing occurred while the defendant was in the commission of an unlawful act and was the result of such unlawful act, is similar to the last objection made to the thirteenth instruction, and for the reason given in the consideration of that instruction cannot be sustained.

The judgment is affirmed.  *Judgment affirmed.*